3rd case, Sullivan v. Warminster Township Mr. McSwain. Mr. Honor, may it please the court, my name is Bill McSwain. I represent the class of talents in this matter, which is Harold Sullivan, who are the parents of the deceased, Sean Sullivan. I know that the court is well familiar with the facts in this case, so I want to get right to the point. I have here in my hand a copy of Plaintiff's Exhibit 69 and Plaintiff's Exhibit 67. That is a police report showing that Officer Sean Harold, who is a critical witness in this case, who is the lead defendant in this case, recovered a black pellet gun just prior to the shooting death of Sean Sullivan in the same investigation that he was running into Sean Sullivan. And the evidence voucher that shows that Officer Harold supposedly destroyed this pellet gun. You know, there's quite a debate about whether there is a difference between a pellet gun and a BB gun. Now, I understand the record in this case to state that a BB gun was found at the scene of the shooting of Sean Sullivan, not a pellet gun. Which was the basis, I think, for Judge Stirk's ruling that you can't talk to Officer Harold about a pellet gun because that's not the gun that was found. Is there not a difference between, first of all, and maybe you can help me out, is there not a difference between a pellet gun and a BB gun? First of all, Your Honor, there is not a difference. The dictionary defines a BB gun as a pellet gun. I used to have a Daisy Red Ryder BB gun, and I also had a pellet gun. They were very different. Boy, weren't they? I had one of each, too, and I certainly remember there was a difference, at least in common parlance back in the day. Now, maybe things have changed, but you told a kid you can have a BB gun, and you told a kid you could have a pellet gun. Kids understood those to be pretty different, both in the force of the projectile and the shape of the projectile. It was the difference between saying you get a .22 or a .45. Kids knew the difference. Your Honor. So you're going on a... Go back to your original question. By the way, I have a BB gun that doesn't work. But you're just basing this on a dictionary definition. Well, let me first of all explain what the record says. The record is clear that what was recovered in the Sullivan backyard is a pellet gun. That's what it was referred to by the parties throughout the case. That's what it was referred to. The defense lawyers referred to it as a pellet gun. All the briefing refers to it as a pellet gun. It's unfortunate that the record seems to refer to that gun found at the scene as both a pellet gun and a BB gun. But in terms of Judge Sirk's ruling, he concluded that that's a BB gun, and the gun that was taken from Mr. Uter was a pellet gun. No, he didn't. He did not give an explanation for his ruling. What happened was Officer Harreld said, I asked him if he had recovered any pellet guns during the course of the investigation in Sean Sullivan. He then said, No, I did not recover any BB pistols in the investigation. At that point, I was getting ready to cross-examine him with his documents that showed that he had recovered a gun just like the gun that was found in the yard. And then we had a sidebar. And unfortunately, Judge Sirk doesn't give any reason why I was not allowed to impeach. Again, this is core cross-examination. I was not allowed to impeach Officer Harreld with Officer Harreld's own documents. Hold on just a second there, Mr. McSwain. First, I want to go back to a premise in your question. You say that this pellet gun from Mr. Uter. I've heard of Mr. Uter. Mr. Uter, that was taken from Mr. Uter, was in the same investigation as the Sean Sullivan investigation. How are we to know that that's the case, that it was in the same investigation? And I think there's actually, that this is not just minutia. It goes to the way you framed the question at the trial. How do we know that the Yoder seizure was something that took place in the course of the Sean Sullivan investigation? Your Honor, it's uncontested, first of all. And the only reason that I would have ever received these documents in discovery, in response to the valid discovery request, is because they were related to the investigation of Sean Sullivan. I would not have received some sort of random document from Eric Uter having nothing to do with Sean Sullivan. So the defendants don't even attest to that. It's clear that this was part of the investigation into Sean Sullivan. Again, getting back to, there's two things that were going on at sidebar when we were discussing whether or not I had the right to cross-examine Officer Harrell with this information. The first issue was this question of whether or not the information was limited. The question of whether or not this might be considered a collateral issue or confuse the jury somehow. We laid out in our briefs why we think that this issue and these documents are very relevant, because the entire case was about the gun. As defendant's own counsel put it, Did you have an obligation to make a foundation, lay a foundation that showed that this was the pistol recovered, was the pistol, or by preponderance could be understood to be the pistol that was taken from Mr. Uter? The foundation that needed to be laid, Your Honor, was that the issue had to be relevant to what's going on in the trial. The whole case was about the gun. And that's what I'm trying to ask you, Mr. McSwain. In order to show that it was relevant, you'd agree with me that the gun taken from Mr. Uter was the gun that was found at the scene. If it's a different gun, by definition, it's not relevant, right? I disagree with that. So you would admit or you would say that the fact that they took a gun like even an hour before, let alone two weeks before, that is not the gun that was found on the property, is somehow relevant to the shooting of Sean Solman? It could be. How? It could be because it shows that Officer Harrell had access to telecoms. Our theory was that the gun was... But your theory is that that's the same gun. The one that he got from Uter is the same gun that was retrieved from the scene. In other words, that he planted a gun to cover up the shooting of Solman. Yes and no. First of all, it's yes because it's possible it was the same gun, but it would be for the jury to decide whether it was. So you don't know if it was the same gun or not. Doesn't that go to relevance and the foundation that you're supposed to present? It goes to respecting the jury's role. It goes to the jury's province to decide whether or not it was. Well, but you want the jury to consider maybe. Maybe this is a gun, maybe not. Isn't that just... Even if the Uter gun was not the gun that was found in the yard, it was also relevant because it shows that Officer Harrell had access to other telecoms. But doesn't the evidence have to be relevant to the issue at hand to be introduced or to be allowed in by the judge? Absolutely. Isn't that why Judge Serk didn't allow the gun? Or your testimony? We don't know why he didn't allow it. I say testimony. It was actually a close examination. You know he didn't because he didn't think it was relevant, right? Let me say for the sake of argument, I don't believe that that's actually what the record shows. Let's say for the sake of argument, the answer to that question is yes. But there's a critical difference here. Once I ask the question, did you recover any other telecoms? And once he testified no, at that point the horse is out of the farm. I have to be able to impeach that answer. It's no longer a question of, well, is the Uter gun relevant or not? It's a question of core impeachment. And this is cross-examination 101. This is absolutely... You have to have the ability to show... But what he said was that he didn't recover a BB gun. Is that right? I agree with you. And you know what? I would have loved to have cross-examined him on that issue. If he was going to try to make an argument in front of the jury about how a pellet gun was different from a BB gun and that he didn't recover, that he recovered a pellet gun from Mr. Uter, but not a BB gun. That the gun in the article... Let me ask you, did you get an opportunity to examine the pellet gun that was retrieved from Mr. Uter? It was taken by the police, I understand, for safekeeping. Did you have access to it? Did you have a chance to see it? Did you make a discovery? Did you try to get a look at it? Did you see a picture of it? The position that Warminster took, according to evidence vouchers, that the gun had been destroyed. So, no, they couldn't present the gun to us. But you did see the gun that was retrieved from the scene of the shooting. That gun was very prominent in the case. But getting back to my point about there's two things going on here. Was the gun, or the Uter gun, supposedly relevant or not? Perhaps reasonable minds could disagree about whether or not that was an area I should have gotten into. I will concede that. But once that question came out, and once that answer was given, I had to be given the opportunity to teach you it. Now assume, for the sake of discussion here, that it's true that the judge should have let you confront the officer with the information about the seizure of the Uter gun, that you should have been allowed to do that. And you weren't. If that's the single problem in the course of a two-week trial, is it your position that that sinks the whole verdict? Absolutely. Because? Let me explain why. First of all, this is not an isolated moment in the trial. This was the climactic moment in the trial. I had tried earlier when I called Officer Harrowing as a witness in my case, because I began to call to all of the officer witnesses. I tried to get into this idea of the drop gun, and Judge Sirk would not allow me to do it. I tried to introduce a pre-employment polygraph test that another officer had taken to show that farmers during the employment applications had asked whether or not he would ever have a drop gun or not. He would not allow me to go into that. So I called that officer up and introduced that document to him, and the officer was remorseful. Then Officer Harrowing came up again, this time in the defendant's case, and I talked to Mr. Sandor on the defense counsel, and we agreed that I would cross him, Officer Harrowing, when he was recalled. They didn't call him again. So I had been waiting the entire trial to get into this. And then the moment comes, and honestly, I have had a fair number of trials in my career, including many of the men you will see in this courtroom, and I have never had a moment that was sort of that easy for cross-examination. This was the equivalent of what I consider a softball right down the middle. Did you try to make a proffer where you were going with your cross-examination? Did you offer to the judge what line of inquiry you were about to go into? I had begun the line of cross-examination and been allowed to do it, but Mr. Sandor only objected and said that the questions I was asking was beyond the scope, which I served over rule bans. So he knew exactly where I was going, and then when I continued down that path, then there was the objection about the sidebar. But I continued answering the previous question. The reason that this matters so much is not only is it the climactic moment in the trial, but the prejudice he was pointing to. This was the Cruz case. This was a case where the jury deliberated for two days and kept coming back question after question about the gun, including the last document they asked to see was the pre-employment polygraph screening of officers in Morsi, which is relevant because it talks about a drop down or a knife. And you were prevented from pursuing that theory of the case. You did pursue that theory of the case, right? That there was a dropped gun. I was not allowed to cross-examine. That's a different point, right? Whether you were allowed to cross-examine Harold the way you wanted to is not the question. I mean, you were permitted to, and you did aggressively pursue the theory that this gun was a dropped gun, didn't you? The way to do that, when you bring it out in cross-examination... I'm not arguing with you about the point that you... I mean, it's clear you would like to have had this piece, but I took it from your last comment that you were saying you were somehow deprived of the opportunity to pursue your theory. You pursued your theory, just not with the evidence you would have liked. Is that correct? There's two ways I did pursue the theory. One is by calling Eric Utero, which we tried to do, and we couldn't find him. We tried very hard, and we couldn't find him. But you argued that issue to the jury, didn't you? I mean, was it not part of your opening statement, your closing statement? Was that... your case hinged on establishing that there was a dropped gun. You didn't present that at all to the jury? I couldn't argue about that in closing when I was denied the opportunity to cross-examine him. You didn't argue that the gun was a dropped gun? We had to come up with some explanation. I mean, that's a pretty straightforward question. You did argue it was a dropped gun, didn't you? Yes, but we did not have the evidence to back it up because our cross-examination was restricted. So the jury was left without the critical information to assess the credibility of the key witness. In this case, I know that one concern, I assume one concern the court has, is deference to the district court. It's not an easy thing to ask a court to overturn a jury verdict. I get that. But this case is not about just deference to the district court. But the standard is abuse of discretion, is it not? Correct, Your Honor. It's abuse of discretion. But this is also a case about deference to the jury. The jury has to assess the witness's credibility. And in the passage, Mr. McSwain, where this all takes place, which is over the course of pages A3011 to A3014, the way it reads is you ask the question, did you recover any black pellet gun during the course of the robbery? Yes or no? The court says, did you? Then you can explain, telling the witness. The witness responds nonresponsively, I did not recover any BB pistols over the course of the robbery investigation to Sean Sullivan. At that point, things go off in a direction about, was this the gun or wasn't this the gun, right? Not in front of the jury. No, no, not in front of the jury. In front of the district court judge. I'm trying to pursue your assertion that the judge abused his discretion. The argument being made by Mr. Santorum at that point is, they're trying to get in through the back door, but you wouldn't let them get in through the front door, which is this, I guess, I'm assuming it's the report about, the police report itself. But in any event, there's a discussion about whether this is the same gun or a different gun with the court on page 3013 saying, it's a different gun, a different length. It seems apparent to me that the district court is wrestling with the idea of relevance. You're trying to get in an argument about a gun and it's a different gun. So what's the relevance? If the district court is not corrected in its understanding of what your theory of the admissibility of the question is at that juncture, can the district judge be faulted? It goes back to what I was saying before about there's two prongs. You're pressing me on the weaker prong. I don't have a great answer for that because the court gave a better explanation about why it didn't necessarily want to get into all the questions about your gun, but gave no explanation about why I cannot accuse you. At that point, did you make any kind of a presentation to the court, Mr. McSwain, and say, okay, even if it's not your honor, he just lied on the stand. He's nonresponsive on the stand. I want to be able to say to him, look, I've got this thing that shows you you did this two weeks ago. I'm allowed to do that whether or not it's the same gun because now he's lying on the stand. Did you make any kind of proffer like that to the district court judge? Absolutely. Show me in the record where that discussion is. It's on page 3013. What are the lines you're looking at because I've got that page open right in front of me. Some of this is more difficult than it should be because you're in sidebar and not everything is captured perfectly, but the exact line would be one, two, three, four, five, six, seven lines down where the court says, well, tell me this. This witness has said he did not recover a, but it should say he did not recover a gun or whatever. That's when we're talking about impeachment. And then I'm quoted as saying his documents won't prove as well. But I'm actually saying there, although it's still part of the court, that the documents don't say that. They contradict that. And then he says, well, tell me what the documents say. And then I get into how Officer Harold and others are on exhibit 69 and how he had actually recovered a BB gun. Well, you'd acknowledge, I hope, and in fact, I think you just have, that at best this passage is a little hard to follow. It could have been transcribed better, but it's clear, I think, what was going on here. What was going on was I'm saying I'm going to impeach this guy. He actually recovered a pellet gun. And he's saying he didn't. And the court says, well, he says it didn't recover anything. No, his documents won't prove as well. Well, tell me what the documents say. And then I get into it. That is a discussion about impeachment. Okay. Again, I want to just sort of summarize the rise of prejudice here. And I'll finish up quickly. This was a close case. Officer Harold was absolutely clean. And the jury here was not just left with some neutral impression. It was not just that I didn't get to get into a key area. The jury was left with a distinct misimpression about Officer Harold's credibility. Because he answered the question, I would say, falsely. And I was given no opportunity to correct him. You actually have time for rebuttal. You can come back to this gentleman. Thank you. Mr. Craven. Thank you, Your Honor. May it please the Court. My name is Charles Craven. I'm here today on behalf of the War Ministry and the defendants. When Officer Harold answered the question that he did not recover any deed, and Mr. McSwain wanted to confront him with records. That was a pretty evasive response, wasn't it? I mean, that had nothing. It was not responsive to the question. Well, I think that Officer Harold, I think, made a distinction that's important. Well, it was not responsive to the question. I thought he was being quite evasive. Did you find a held gun? And his answer was, I didn't find a deed. But the point of the, I'll admit it's not a direct answer to the question. But it's an answer that fits directly into the case. Because the gun that was on the records, that was taken from Uter, was described as a black plastic HFC pellet gun. There's a distinct difference between a pellet gun and a BB gun. There's a distinct difference between an HFC plastic gun and a metal PPK gun. The metal PPK gun is a different manufacturer, made out of different materials. It's a different shape. And it's totally different from this plastic gun that was taken. And in the records, the evidence voucher, plus the report by Officer Outland and report by Officer Harrell, refers to a plastic HFC pellet gun. How that gun is relevant to this case. How about it's relevant at least at the juncture of basic cross-examination. Mr. McSwain says, I'm assuming it's for purposes of argument only, give you that it might be the different gun. Okay, just set that aside. I'm absolutely entitled, once that guy has been evasive and started messing around on the stand, to smack him and smack him hard with the police department's own records and point out how can you say you didn't take a pellet gun when I've got this document that shows you did take a pellet gun. And I'm entitled by evidence law and by good sense to be able to confront an evasive or lying witness with direct evidence like that. And it's an abuse of discretion to prevent me from doing that. You need to respond to that argument, please. Your Honor, it's not an abuse of discretion to prevent a line of cross-examination that has no relevance to the case. Isn't that always relevant? Isn't impeachment always relevant? Impeachment's important, I agree. But how far do we go with this? What I'm trying to get at is, Your Honor, let's say the line of questioning goes like this. Did you recover a pellet gun during the course of the investigation of Sean Sullivan? No, I recovered a BB gun. Well, wait a minute. You're making a distinction, Officer, between a pellet gun and a BB gun. Isn't it true you did recover a pellet gun? Yes. Okay. So he's been impeached in front of the jury. What does the jury then do with that evidence? I don't know. I don't know. But aren't they entitled to hear it? That's the pitch that your other side here is making is, what the jury does with it, we don't know. That's the problem because the jury never knew it, so we don't know what they did with it. But they were entitled to hear it, weren't they? That's their argument. The jury, I think, was entitled to hear evidence that's wrong. It's like saying to Officer Seboer's jury, Officer Harriman, isn't it true that you were asked on an application? Well, he never asked this question. Isn't it true you were asked on an application whether you have a pellet gun? How does that affect the case? It's a question. Well, it shows that he can't be trusted to give a straight answer on the stand, for one thing. If you're allowed to present him with a document that shows that the answer he gave just a moment ago was evasive. As Your Honor pointed out, if we go back to the record, the dialogue on the record that the trial court said in 3013, one of the theories of the case is that the gun was planted. Ms. Wayne, yes. But you're trying to prove that on another occasion this officer found a different gun. Mr. McSwain, I don't think it's necessarily a different gun. The question is that the report is sustained. Listen, for purposes of the conversation we're having here today, let's take it as a given that the district court made a decision that the gun for that purpose was irrelevant. I'm trying to steer you back to the point that Mr. McSwain spent the larger part of his precious argument time on, and that is I was entitled to impeach, and I was prevented from basic impeachment. Now, what is the response that you've got to that? Is it he's not entitled to impeach? Is that impeachment would have made any difference here in light of other evidence? Is it some other thing? What's the pitch the defense has got in response to the assertion that, hey, I'm at least allowed to point out that he's a lying so-and-so or an invasive guy? The response is it would have made no difference in the case. Because? It would not have proven that John Sullivan did not have the gun that was found at the scene. Two guns were different. It would not have proven that Officer Harrell planted the gun, which is the theory. Why not? If he got a pellet gun, it's called a pellet gun by Mr. McSwain, from Uter, and a pellet gun was found at the scene, that goes right to the heart of the plaintiff's case. It's a planted gun. The gun that was found, was taken from Uter, was a black plastic HFC gun, which is different. It's not just in terms of the ammunition case. Was all of this presented to Judge Surik at the time that he cut off Mr. McSwain's cross-examination? I think by this, this is at the last day of trial. The Judge Surik has already seen what the gun was that was recovered, this metal gun. But he had not seen the gun that was taken from Uter? No. No, because it was taken and destroyed. But description is on the evidence records that the counsel was referring to. It's referred to as a black plastic HFC pellet gun. The evidence voucher for the gun that was found at the scene is a black Walter PPK BB caliber gun. That gun was a metal gun that has a distinct shape. It looks kind of like a .45 caliber gun that the officers wore at World War II. When was the description of the gun that was taken from Uter prepared? When was it prepared? Yes. I think you have it in your hand. It was on the day of the incident, which was 3-14-06. The day of the incident, meaning the day that Harrell took it from Uter? Yes. And also it's in Officer Outland's report, which is the same day. And I have to add, too, when Officer Harrell testified, he was called as a witness in the Plants case. The counsel says that he was prevented from asking about the Uter gun. He was not. He had Officer Harrell on a stand in his case. Didn't ask him about the Uter incident. He had Officer Outland, who was part of that group that confronted Uter, on the stand. Never asked him. Officer Springfield, Lieutenant Springfield, was there. Never asked him. And there was one other officer involved. Never asked him. Waited until the entire trial was over, and then asked this question. And the theory behind the question is not simply to, you know, it's second-guessing now, to say, oh, I wanted to destroy Harrell's credibility. The theory as expressed in this report was, well, you wanted to prove that he planted a gun. The gun that was found was planted. But the gun that was taken from Uter was a different gun. So how can you say that the gun that was taken from Uter is the gun that was found in the background? They're totally different. Well, I think the way you say it is the way Mr. McSwain did a few minutes ago, which is I didn't have to prove on behalf of my clients that it was the same gun. I only had to prove that the police had access to these type of guns and that, in fact, they'd had it as recently as two weeks before and that that was one more thing that the jury was entitled to weigh in deciding whether or not this was a planted gun. Not necessarily Uter's gun, but a planted gun of this type. And I think for purposes of his argument, he would concede that. The point is not it's the same gun. It's that it's not a hard thing for the police to have access to these kind of guns. They get these kind of guns. And having these kind of guns is something that, I guess, is handy to have if you're going to drop a gun. Why drop a perfectly good .45 when you can drop a carbine BB gun? But that's what was going on here. And the jury should have known that they had access to this. That's the pitch that I think they're making. Maybe they're wrong, but I think they're making that pitch. And so assume they're different guns. Isn't he still allowed to make the point that, hey, they've got these kind of guns around and they're the kind of guns that would get dropped, and the jury should know that? I don't think that that's what he was trying to say, because . . . Well, I'm sorry. He's sort of . . . I put too many words in his mouth, perhaps. But I understand him to be making that kind of argument to us now. What's wrong with that argument? That's not the argument he made to the district court. The argument he made to the district . . . The district court asked him, why do you want to ask this guy these questions about carbines? And it's because you want to prove that he planted the gun. This is a different gun. So it's not relevant. And . . . This conversation took place at sidebar, Mr. Craven? I'm sorry? This conversation took place at sidebar? Yes, it did. We're going to have to move on, Mr. Craven. Thank you very much. Thanks very much. Ms. Peek? Ms. Peek? Hi, can you hear me all right? My name is Ms. Peek. I'm here representing the Warrington Township defendants. Procedurally, I just want to point out that at the time of trial, there was only one Warrington defendant still as a part of the case. The remaining defendants had been dismissed prior to trial. So John Mitchell was the only remaining defendant. And I just wanted to point that out in reference to the trial, since he was the only one remaining defendant. And I don't think Plaintiff's Counsel pointed that out. It's either me or the parents. As far as the issue regarding the Yoder gun, we kind of defer to Warrington's arguments regarding whether the Yoder gun was relevant to this cause of action. In addition to what was already discussed, I want to point out that when this issue came up, it was during the cross-examination of Officer Harrell during the case in chief of the Warrington defendants. So in addition to it not being relevant, it was also beyond the scope of direct examination. And Plaintiff's Counsel had plenty of opportunity in his case in chief to develop this theory, which he did not. And I think it's crucial to point out that his theory changed throughout the trial. It was Mr. Sullivan did not have a gun. There was no argument in his opening statement about a drop gun at all. And then in his closing, his position was he may have had a gun, but he dropped it during his running through the backyard of his residence. So I'm just pointing that out. I don't think Plaintiff's Counsel had a clear theory throughout the litigation. I think he's presenting his argument today before you guys that his theory was clear, but I don't think it was. I wouldn't say you guys, though. So Mr. McSwain, in his closing statement, stated that he may have had a gun, but he dropped it. Isn't he entitled, Ms. Peek, to make alternative arguments? When you say there was some shifting ground there, but even if the ground's shifting around a little bit, would you concede that the plaintiffs are entitled to have more than one basis on which to argue for the admissibility of a piece of evidence or a line of questioning? I agree that he could have more than one basis for his admissibility of evidence, but I don't think it was clear to the judge at the time that he made this ruling that he wanted to produce this evidence to show that the officers had access to pellet guns. I don't think that argument was very clear on the record, and I don't think it was clearly presented during the trial. Okay. Thank you. Thank you. Okay, that's it. Thank you very much. Mr. McSwain. I know I only have a few minutes here, so I just want to, again, just strip it all down and get right to the core point. This is not a case about relevance. Everything Mr. Craven was talking about doesn't matter. This is a case about impeachment. Wasn't it a case in which we have to figure out what was presented to the district court judge, and if the district court judge was reasonably under the impression that it was a case about relevance, he can't really be faulted for making a judgment about relevance, right? I think he can because our argument is that the whole case was about the gun, the origin of the gun. As Mr. Goldberg said on the defense counsel, it's all about the gun. So we would argue, of course it's relevant. Of course he should have let in because we should have had an absolute right to get into the issue. But even if you disagree, even if you disagree with that, Your Honor, again, I'll concede that for sake of argument. There's no way to get around the impeachment issue. There's just no way to get around it. And what they're talking about is, well, the guns were different and one was plastic. I can just say one word about that. None of that's in the record. None of that's in the record. And all the speculation about what Officer Harrell would have said about Beebe and Pellett being different, none of it's in the record. It's in the record, the police report that you proffered, right, with the description of the gun, correct?  You didn't mark it for identification. I was going to use it for cross-examination. I was denied so it was not admitted to evidence. I guess I should ask this. Are you telling us that at no juncture the district court judge was ever apprised of that document and what it said? Well, sure it was because it was part of the exhibits. Sure. Okay. So if it was not admitted into evidence, it was nevertheless marked and was prepared to be submitted as part of a pretrial order, right? Yes, pretrial. It was a part of the exhibits. Right. Okay. So we're in the job here of trying to second guess without second guessing too much, right? I mean, it's an abuse of discretion standard. And one of the things we have to do is try to put ourselves in the posture of the district court at the time you're making the proffer, such as it is in the maelstrom of a trial. I think, you know, all or most of us have been there. You're at sidebar. You're doing the best you can. The judge is doing the best he can. Defense counsel is doing what they can. And you're making a pitch to the court. The pitch that's made to the court, when you say there's no justification for what happened here, how about that the district court judge, hearing you at sidebar, understands you to be making the assertion, this is the gun, and then says, I don't see that you've laid a foundation for that. You can't pursue that. Are you saying that this record could not fairly be read in that way? No, it cannot. Because? Because of what we just talked about before, about how I say these documents don't prove as well as what the words say, what I was saying was... Because of what's on A313. Yes, Your Honor. Absolutely about impeachment. And that gets to the point about sort of who's asking for what here. I'm not asking for much. I know that I'm asking for a jury verdict to be overturned, but in terms of the legal principle, which is what I think that we care more about than sort of the individual case because you're an appellate court, I'm not asking for much. I'm simply asking for the right to impeach the most important lead defendant with his own documents to show that what he said was not true. Conversely, defendants are asking you for the world. They are asking you to adopt a principle that no other court in any jurisdiction in the entire country has ever adopted, which says that you're not allowed to impeach a party witness with his own documents. Shouldn't we have some concern about whether the judge's ruling in this case was so bad or so abusive that it affected the whole trial, that the result would have been different had you had the chance to impeach him? Absolutely. I mean, the result would have been different. Now, I think Judge Sterak did a hard job. But Mr. Craven very well pointed out that the description of the gun that was taken from Uter in a report that was prepared simultaneously with the taking of that gun differs from the gun that was found at the scene. First of all, everything Mr. Craven is talking about is not in the record. None of this stuff is in the record. Is the report of the gun taken from Uter not in the record? He just brought it up for the first time? The documents, the plaintiff's exhibit 67 and 69, which I attempted to cross-examine, is not in the record because I wasn't able to use it. It's in the appellate record, but not in the district court record. But it was before the district court. When you say it's not, I mean, I don't want to play semantic games here, but you're making it sound like this isn't what would have been in front of the jury. I mean, the question is, would this have affected the jury verdict if you had gotten it in? And the point Mr. Craven is making is, no, it wouldn't, leaving aside all the other stuff that they had. I mean, neighbors who came in and said, that's not the way I saw it, pretty potent evidence, very powerful evidence. More than one set of neighbors coming in and saying, I didn't see it that way. I mean, if you couldn't get the jury to buy that the officers were lying based on that, are you going to get them to believe that they're lying based on a police report that describes an entirely different gun than the one that's in evidence in front of them? That's what I take Mr. Craven to be saying and what I think Judge Fuentes is asking, and I, too, would be interested to know how you respond to that. How does that thing matter in the light of a two-week trial evidence where you've had some pretty big guns blown away at the credibility of the officers? I would say that it would have made all the difference in the world. It would have made all the difference in the world because Officer Harrell's credibility was the key issue in the case. Officer Harrell was the lead officer here. All the other officers basically followed his story. So we laid out in the briefs, he's the one who, when they all got into a room after the shooting, explained to Chief Murphy exactly what happened and earshotted everyone and explained to Detective Boston, when he was coming up with the search warrant, everything that happened. All the other officers just wrote down what Officer Harrell had told them. What a coincidence that all of the statements are almost word for word the same. So the credibility of Officer Harrell is absolutely key. There's also that jury instruction that says, false in one, false in all. If you decide that Officer Harrell is not completely credible on one issue, you can disregard all of his testimony. So what would the jury have done if I had had a chance to cross-examine Officer Harrell with this impeachment material? They would have believed Kelly and Robert Franks. Because they were the eyewitnesses who said there's no chance, no chance that there was a gun in Sean Sullivan's hand. Either when he was running across the yard or when he dropped out of the window. Okay, Mr. McSwain, you want to finish up, please? Thank you, Mr. McSwain. This is a case of bad management. We're not asking for much. Many of the defendants are asking for much more than we ask of you. I'm in favor of $100,000. Thank you very much. Thank you, Mr. McSwain. We'll take your good points on that.